**WHITINSVILLE SPINNING RING CO. et al. v. R. K. LAROS SILK CO.**
(two cases).

Nos. 8615, 8617.

District Court, E. D. Pennsylvania.

April 28, 1937.

Sundheim, Folz & Sundheim, of Philadelphia, Pa., and Cushman, Darby & Cushman (by Arlon V. Cushman and William M. Cushman), all of Washington, D. C., for plaintiffs.

Edmonds, Obermayer & Rebmann, of Philadelphia, Pa., and Jeffery, Kimball & Eggleston (by Oscar W. Jeffery and Harry G. Kimball), all of New York City, for defendant.

KIRKPATRICK, District Judge.

These two suits in equity for patent infringement were tried together. They are admittedly defended by the manufacturer, Whitin Machine Works, which will be referred to as the defendant, though the record party is a user. The patents are United States No. 1,781,828 to Whiteley, and United States No. 1,899,635 to Powrie. Validity and infringement of both are involved. There was also a question as to the inventorship of the Powrie patent.

The patents are for devices for automatically lubricating spinning rings. They have to do with lubrication rather than spinning, and, to understand their purpose, the latter art need be referred to only very generally. One part of a spinning or twisting machine is a steel ring, usually two or three inches in diameter. A small metal body, usually ear-shaped, is hooked to the ring, and, with the strand of silk or cotton threaded through it, flies around the ring's inner surface at tremendous speed, sometimes as high as twelve thousand revolutions per minute. Naturally the lubrication of the bearing point or points is very important. The old way was by greasing the ring manually. This involved stopping the machinery to apply the grease. Sometimes excess grease got on the yarn or was thrown off on the floor. Oil is a much more satisfactory lubricant, and the purpose of both patents is to keep the ring oiled while the machine is operating.

The main idea of the Whiteley patent is to cut a groove, in which an absorbent wick is placed, around the inner face of the ring, the ends of the wick coming out through two holes drilled close together in the groove and making engagement with a pad soaked with oil. Capillary attraction keeps the entire wick saturated, and from the wick the oil gets to the inner surface of the ring and the bearing points of the traveler.

The Powrie patent embodies the same general idea, except that, instead of a single groove around the inner face of the ring, it has a series of short grooves in alignment each having holes at both ends, through which the wick is threaded; so that the lubrication comes from a series of segmental grooves in each of which a length of wick is seated. This patent probably was meant to avoid the rather deep groove which the Whiteley device made necessary. That was because the wick would not stay in place in the long groove unless it was held thus by a wire core or something of the sort, and that meant a thick wick and a deep groove which might weaken a very thin ring.

The defendant makes two types of rings. In the first, or "one-spot," type there is a single short horizontal groove in the inner surface of the ring, not more than ten degrees of the circle in length. Two holes, rather close together in the groove, lead diagonally downward through the ring to an oil reservoir with a pad. A wick is pulled through the holes so that a section of it lies in the slot from one hole to another, and both ends are in the oil reservoir. The defendant's "two-spot" type is exactly the same, except that it has two short grooves oppositely disposed, each with its own separate wick and oil reservoir. In both types the grooves are placed nearer the top of the ring than in Whiteley's commercial device; the purpose being to avoid direct contact between what is known as the "knee" (the principal bearing point of the traveler) and the wick. The knee of the traveler probably bears just about upon the lower edge of the groove.

Taking up the Whiteley patent: On the question of invention and the scope to be given the claims it may be well to say a word about its place in the industry and its relation to the prior art..

While it was not the first automatically lubricated spinning ring to be sold, it has met with a fair measure of commercial success, and occupies a substantial part of the field. The plaintiff, Whitinsville Company, which now practically has the monopoly, has sold roughly a quarter of a million out of the five million comparable rings in use, over a period of five or six years. They are of course more expensive than the old type of hand-lubricated ring, and, while they are more convenient, apparently manufacturers require some education to be convinced that they are worth the difference. They have by no means revolutionized the industry, and I cannot find convincing evidence that their use has resulted in any striking increase in the speed of the machines, or that it has had any very great effect upon the spinning art in general.

Turning to the prior art, it is at once apparent that the margin which it left for the exercise of invention was a very narrow one. The prior patents need not be discussed in detail, but in general it may be said that the idea of the automatic oiling of ring bearings by means of a wick brought from an oil reservoir through the wall of the ring to the inner surface was old. In the first forms the end of the wick simply came through a hole and was cut off flush with the wall so as to make a single, round, lubricated spot from which the traveler carried the oil around the ring. Next, the exposed surface of the wick was elongated (so that instead of a round hole you had a slot filled with the lubricated wick). Then, the wick was carried all the way around the ring in a groove, though not on the inner surface of the ring but on the under surface of a sort of flange; this construction being required by a different type of traveler. The patents for these types, as well as several others, were specifically directed to the lubrication of rings in spinning machines; a field which one would think a rather narrow one to begin with. Besides these, the lubricating art generally shows a great many automatic devices which are quite similar, involving the use of a groove in the bearing and a wick in the groove, communicating with an oil reservoir. (See particularly Lamy, 1,331,440, which, if it were in the spinning art, would be very nearly a complete anticipation.)

In view of this prior art it seems clear that Whiteley is not entitled to a broad interpretation of his claims, and we read them to see just where the novelty of his patent resides. Claims 1, 10, and 12 are the claims sued upon. Claim 10 reads as

follows: "A spinning ring having an annular groove formed in the inner wall thereof and a radial opening extending outwardly from said groove, and an absorbent wick arranged within said groove and extending through said opening."

Claims 1 and 12, while adding some additional elements to the combination, differ mainly in using the expression an "annular disposed groove" instead of merely an "annular groove," and in calling for contact between the traveler and the wick.

Now, I think it plain that when Whiteley called the groove "annular" or "annular disposed" he meant a groove extending all the way around the inner surface of the ring. His specification and diagrams give no hint of any other kind. And I think it equally plain that when the Patent Office issued the letters it was upon that understanding. The file wrapper history shows that Whiteley's original claims were drawn for a ring having an "helical, oblique or any other form of groove or grooves." This claim was rejected as fully met by Towers (1,583,-431) and Evans (1,742,241). Now, Towers was the patent which had an elongated slot, the opening of which together with the surface of the wick in it of course conformed to the curve of the ring. Functionally, that is so far as getting oil from the wick to the wall of the ring and the bearing of the traveler is concerned, there is not the slightest difference between the slot and the groove, and the Patent Office, when it rejected a claim for "any other form of groove" upon a reference which disclosed an elongated slot, must have been of that opinion. Whiteley met the objection by canceling his claims and substituting claims which called for annular and annular disposed grooves. He also canceled a portion of his specification which described his invention as comprising a wick contained "in an internal annular or other groove," and substituted a new portion which contained the statement, "it is essential that the wick (hereafter fully described) shall encircle the inner part of the ring." In other words, the Patent Office held that the slot of the Towers patent, while it was the equivalent of a groove, was not annular or annular disposed, and the patent was granted upon the agreed interpretation that those terms meant a groove going all the way around the ring. Apart from the proceedings in the Patent Office, that would certainly be the natural construction, and it requires a good deal of straining to say that a groove extending over possibly ten degrees of a circle is ring-shaped, which is what the term annular means.

So construed, the defendant does not infringe the patent either in his one-spot or two-spot ring. The "spot idea" is plainly quite outside the Whiteley theory of lubrication; a fact which seems to be in line with the plaintiff's own views of the matter, expressed in advertisements ·in which it again and again insists, for example, that "Eady· ring lubrication is utterly different from one-spot lubrication," or "Our exclusive patented design gives lubrication all around the ring instead of in only one spot," and similar statements.

If another reason for noninfringement were necessary I should not hesitate to hold that one is to be found (so far as claims 1 and 12 are concerned) in the matter of contact between the traveler and the wick. When Whiteley calls for such contact he means that the bearing point of the traveler comes fairly against the surface of the wick. In fact, he points out in his specification that he makes his annular groove slightly oblique so that "it will make contact with the traveller across practically its whole bearing surface during each revolution."

It is extremely doubtful whether the defendant's device gives any contact whatever between the traveler and the wick. There is no difficulty in accepting the defendant's view that the ordinary seepage of oil from the wick, perhaps assisted by the windage of revolution, is ample to lubricate the ring surface. There is no doubt that the defendant intended and tried to avoid contact. It may be that its traveler, as it revolves, touches what were called the "whiskers" or fine filaments extending from the wick; but this is certainly not what is meant by the traveler "extending across said groove so as to contact with the absorbent wick," as stated in the claims.

In the Powrie patent the problem was, as has been suggested, to work out a way of using the Whiteley patent, with its all-around lubrication and rather deep groove, in connection with thin rings. To do this it was necessary to take out whatever stiffening had been used for the wick and find some other way of holding it in place. Hence the idea of lacing the wick in and out through holes drilled in the ring, which requires the use of short segmental grooves in the place of one groove extending all the way around.

I do not know why this thought would not have occurred to any person skilled in the art who was given the job to do. As a matter of fact, the only prior spinning ring lubrication patent in which this problem had arisen solved it in the same way. Evans had a wick which had to be held in place because it was on the under side of the ring and would fall out. He held it up by lacing. The expedient is almost too simple to make it proper to say that Powrie combined the Evans patent with Whiteley, because that would imply that the idea might not have been hit upon without resort to them. It is certainly not an inventive advance.

In addition, there is no harm in saying that if the patent were valid it would not be infringed by the defendant's structure. The claims (1, 2, and 4 are in suit) are not to be construed any more broadly than Whiteley's. If the Patent Office proceedings be examined it will be seen that, in granting Powrie his patent, the Office held him inexorably to the idea of a wick threaded in and out of grooves. The applicant was compelled to cancel claims calling for a wick threaded in and out of a ring around or partly around the interior surface thereof and a ring with a groove or grooves and a wick threaded in and out of said groove or grooves. In his drawings he had a Fig. 8 which showed exactly the defendant's structure and, after canceling the claims referred to, he tried again with a new one to the same general effect, pointing out that unless it was granted he would "not secure exclusive rights as to the device shown in Figure 8." This claim was rejected, however, upon the same references with the suggestion that the applicant could appeal if dissatisfied. The applicant then canceled. Of course Fig. 8 should have come out of the drawings, because there was no claim left to cover it, but it was apparently overlooked.

Here we have an interpretation on the claims by the Patent Office, fully acquiesced to by the applicant, which limited them to one wick, all around the ring, threaded through openings in a multiplicity of grooves, and which excluded the defendant's device not only in words but by reference to a drawing; excluded it, too, after the applicant had pointed out that the interpretation he asked for was necessary to give him rights in the structure represented by the diagram. The intention could not have been plainer had the applicant brought one of the defendant's structures into the Patent Office and agreed to its exclusion from his claims as a condition for the grant of the patent.

### Conclusions of Law

(1.) The defendant's devices in evidence do not infringe claims 1, 10, and 12 of the Whiteley patent.

(2.) Powrie, 1,899,635, is invalid for want of invention.

(3.) The defendant's devices in evidence do not infringe claims 1, 2, and 4 of the Powrie patent.

The validity of Whiteley 1,781,828 is not determined.

No finding or conclusion is made upon the question of the priority of invention as between Powrie and Aldrich.

The bill may be dismissed, with costs.